IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| WHOLESALE ALLIANCE, LLC<br>d/b/a PHARMACY FIRST and<br>THIRD PARTY STATION,<br><br>    Plaintiff,<br><br>vs.<br><br>DGN PHARMACY INC.,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>) Case No. 2:18-cv-02649<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR DECLARATORY JUDGMENT**

COMES NOW Plaintiff Wholesale Alliance, LLC d/b/a Pharmacy First and Third Party Station ("Pharmacy First"), and for its Petition for Declaratory Judgment against Defendant DGN Pharmacy Inc. ("DGN") states:

**PARTIES, JURISDICTION & VENUE**

1. Pharmacy First is a limited liability company organized under the laws of Delaware and registered to do business in Kansas. Pharmacy First is headquartered in Overland Park, Kansas.

2. Pharmacy First has six members:

 (a) Dakota Drug, Inc., a North Dakota corporation with its principal place of business in Minot, North Dakota;

 (b) Louisiana Wholesale Drug Company, Inc., a Louisiana corporation with its principal place of business in Sunset, Louisiana;

2304074

  (c)  The North Carolina Mutual Wholesale Drug Company, a mutual association incorporated under the laws of North Carolina with its principal place of business in Durham, North Carolina;

  (d)  Rochester Drug Cooperative, Inc., a New York corporation with its principal place of business in Rochester, New York.

  (e)  Smith Drug Company, a division of JM Smith Corporation, a South Carolina corporation with its principal place of business in Spartanburg, South Carolina; and

  (f)  Value Drug Company, a Pennsylvania corporation with its principal place of business in Duncansville, Pennsylvania.

3.  Pharmacy First is a citizen of Louisiana, New York, North Carolina, North Dakota, Pennsylvania, and South Carolina.

4.  DGN is a New Jersey corporation with its principal place of business in East Rutherford, New Jersey. Accordingly, DGN is a citizen of New Jersey.

5.  Jurisdiction and venue are proper in this Court because Pharmacy First and DGN are parties to an agreement, discussed more fully below, which provides that venue for any litigation brought under said agreement shall be proper in any state or federal court located in Kansas.

6.  This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a)(1) because it is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## GENERAL ALLEGATIONS

7. Pharmacy First is a pharmacy services administrative organization ("PSAO"). Among other things, PSAOs serve as intermediaries between independent pharmacies and the pharmacy benefit managers ("PBMs") that administer the prescription drug portion of healthcare benefit programs, including commercial health insurance plans and Medicare Part D. PSAOs contract with PBMs on behalf of its member pharmacies, thereby providing its member pharmacies with access to those PBMs' networks. Pharmacies may also access these networks through direct contracts with PBMs even if the pharmacies are not members of a PSAO.

8. PSAOs also offer support services to their member pharmacies, including reconciliation of claims submitted to PBMs for reimbursement.

9. On or around June 13, 2017, Pharmacy First and DGN entered into a Pharmacy Services Agreement (the "Agreement") (Exhibit A).[1]

10. Among other things, the Agreement gives DGN access to the networks of the PBMs with which Pharmacy First has contracted on behalf of its member pharmacies provided that DGN complies with certain conditions and obligations imposed by the Agreement.

11. In accordance with the Agreement, Pharmacy First also provides reconciliation services to DGN, by which DGN submits claims for reimbursement directly to a PBM and the PBM then remits payment to Pharmacy First to disburse to DGN. Pharmacy First monitors the reimbursement process on DGN's behalf to ensure that its claims are being processed and paid in compliance with DGN's agreement (through Pharmacy First) with the PBMs.

---

[1] Because the Agreement contains a confidentiality provision, Pharmacy First intends to seek leave to file the Agreement under seal as Exhibit A immediately after the filing of this Complaint.

12. In the past year, Pharmacy First has disbursed more than $1.2 million in reimbursements to DGN.

13. DGN has pending receivables of approximately $85,000.00 from various PBMs, which Pharmacy First may be required to disburse subject to various restrictions imposed by the Agreement and the PBMs.

14. As long as DGN continues to submit claims, on a daily and weekly basis, Pharmacy First will continue to incur purported liabilities to remit payment to DGN for those claims. Although Pharmacy First has effectuated a lawful termination in accordance with the terms of the Agreement, Pharmacy First believes that DGN will continue to submit claims well beyond the effective termination date of December 20, 2018 and attempt to hold Pharmacy First responsible for reimbursement of those claims. Based on the current receivable and the level of reimbursements to DGN in the past year, among other things, there is more than $75,000.00 in controversy in this case.

15. Section 4.3(a) of the Agreement provides that either party may terminate the Agreement without cause upon thirty (30) days' prior written notice to the other party.

16. On September 20, 2018, Pharmacy First provided notice to DGN under Section 4.3(a) of the Agreement that it was terminating the Agreement without cause, effective October 20, 2018.

17. Termination of the Agreement affects when and how DGN receives reimbursement for the prescriptions it chooses to fill. Termination of the Agreement will not affect the ability of any patients to fill their prescriptions with DGN or any other pharmacy.

18. Pharmacy First previously sent a notice of termination to DGN on or around August 23, 2018 (the "August 23rd Notice"), but due to an internal error the August 20 Notice was delivered to DGN's former address rather than its current address.

19. DGN learned of the August 23rd Notice and Pharmacy First's intent to terminate DGN on or before September 10, 2018.

20. On September 14, 2018, Lawrence Margolis, DGN's Chief Executive Officer, represented to Pharmacy First that DGN was in contact with other PSAOs and with third-party payers (PBMs) directly in an attempt to secure contracts with these entities in light of Pharmacy First's decision to terminate the Agreement.

21. On September 18, 2018, Lawrence Margolis, DGN's Chief Executive Officer, represented to Pharmacy First that it would take between six and eight weeks for DGN to secure a contract with another organization.  The following day, Mr. Margolis represented to Pharmacy First that this process would take four to six weeks.

22. Also on September 20, 2018, an attorney retained by DGN sent a letter to Pharmacy First.  Among other things, this letter characterized DGN's patients as "victims," declared that "under no circumstances" would DGN consider termination upon thirty days' notice—as expressly provided by the Agreement—to be "legally enforceable," and asserted that "common decency would require a notice of not less than six (6) months."

23. On September 29, 2018, Pharmacy First granted DGN a 10-day extension of the effective termination date.

24. On or around October 9, 2018, DGN, through its attorneys, requested an additional 30-day extension of the termination date, from October 30, 2018 to November 30, 2018.

25. On October 22, 2018, Pharmacy First, through its attorneys, agreed to extend the termination date by sixteen (16) days, from October 30, 2018 to November 15, 2018. On the phone with DGN's attorneys and in an email later that day confirming the extension, Pharmacy First's attorneys emphasized that this would be the final extension offered.

26. Two weeks later, on November 5, 2018, one of DGN's attorneys sent an email to counsel for Pharmacy First stating that DGN was "running into certain snags" in its transition to direct agreements with PBMs and requesting a conference call involving outside counsel and business personnel from both parties.

27. In response, counsel for Pharmacy First offered to pass any questions on to Pharmacy First, but reiterated that Pharmacy First did not intend to offer any additional extensions to the current termination date of November 15, 2018.

28. On November 12, 2018—three days before the November 15, 2018 termination date—DGN, through its counsel, requested a 30-day extension.

29. Pharmacy First, through its counsel, responded that the November 15, 2018 termination date was firm and reminded DGN's attorneys that when Pharmacy First granted the second extension on October 22, 2018, it emphasized that there would be no further extensions.

30. At 9:55 p.m. on the evening of November 13, 2018, counsel for Pharmacy First received an email from DGN's attorneys threatening to file an application for an emergency temporary restraining order unless Pharmacy First granted a 90-day extension of the termination date. DGN demanded a response by 11:00 a.m. the following morning.

31. In an effort to further compromise and avoid the expense of litigation, Pharmacy First granted DGN a third extension of the termination date, from November 15, 2018 to November 22, 2018.

6

32. At 3:42 p.m. on Friday, November 16, 2018, Pharmacy First received a proposal from DGN wherein DGN again threatened to seek an emergency temporary restraining order unless Pharmacy First agreed, among other things, to extend the effective termination date to the earlier of February 25, 2019 or the effective date of the direct contracts which DGN hopes to secure with two of the three PBMs from whom DGN receives the most money in reimbursements. (DGN already has a direct contract with what it claims is its top PBM in terms of reimbursements.) The February 25, 2019 termination date proposed by DGN is more than ninety days after the current termination date of November 22, 2018, and more than four months after the original termination date (set in accordance with the terms of the Agreement) of October 20, 2018. DGN demanded a response to its proposal by 11:00 a.m. on Monday morning.

33. On the morning of November 19, 2018, Pharmacy First informed DGN under the circumstances, including the multiple extensions already granted by Pharmacy First and DGN's refusal to answer Pharmacy First's simple and reasonable questions about DGN's business model, a 90-day extension was not reasonable. As a further and final accommodation, Pharmacy First did, however, agree to extend the termination date by thirty days, until December 20, 2018. Pharmacy First also asked DGN to confirm that it had not waited until the week of November 5, 2018 to begin exploring a direct contract with one of the PBMs that DGN identified as most important from a reimbursement perspective.

34. DGN responded at 3:46 p.m. the following day, November 20, 2018, demanding that Pharmacy First agree to an extension of at least 60 days in exchange for its agreement not to seek an emergency temporary restraining order. Consistent with its past practices, DGN afforded Pharmacy First an unreasonably short window of time to respond and demanded that Pharmacy First confirm "by the end of the day" whether it was amenable to DGN's proposal.

35. In response to DGN's "proposal," Pharmacy First pointed out that in light of the fact that Pharmacy First had extended the termination date to December 20, 2018—a date that was still a month away—DGN did not have grounds to seek an emergency temporary restraining order.

36. On or around November 15, 2018, DGN, through its attorneys, informed Pharmacy First that DGN would not be entering into an agreement with another PSAO for a variety of reasons. Although some PSAOs denied DGN's applications to join their networks, DGN **chose** not to pursue contracts with other PSAOs **because they did not align with DGN's business model**.

37. DGN has known for weeks, if not months, that there was a possibility that DGN would not be admitted by any PSAO and therefore would need direct contracts with third-party payers (PBMs).

38. DGN has failed to respond to Pharmacy First's inquiry concerning whether DGN waited until the week of November 5 to begin exploring a direct contract with what it claims is one of its most important third-party payers.

## COUNT I
## DECLARATORY JUDGMENT

39. Pharmacy First incorporates by reference the allegations previously set forth in this Complaint.

40. An actual and justiciable controversy exists between Pharmacy First and DGN concerning Pharmacy First's right to terminate the Agreement effective December 20, 2018.

41. Pursuant to 28 U.S.C. § 2201, Pharmacy First seeks a judgment declaring that it was within its rights to terminate the Agreement and that the December 20, 2018 termination date is proper, both of which are disputed by DGN.

42. This matter is ripe for adjudication because Pharmacy First's present rights under the Agreement are at stake.

43. The declaratory relief sought by Pharmacy First is necessary and proper to settle the existing dispute between the parties and provide relief from uncertainty with respect to the propriety and effectiveness of Pharmacy First's termination of the Agreement.

44. Pharmacy First has no adequate remedy at law.

WHEREFORE, Pharmacy First respectfully requests that the Court enter an order and judgment declaring that termination of the Agreement by Pharmacy First was proper and said termination shall be effective December 20, 2018, awarding Pharmacy First its attorneys' fees and costs pursuant to the terms of the Agreement, and granting such other and further relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

**LEWIS RICE LLC**

Dated:  November 29, 2018     By:  /s/ Winthrop B. Reed, III
Winthrop B. Reed, III, #78794
600 Washington Avenue
Suite 2500
St. Louis, Missouri 63101
(314) 444-7600
(314) 241-6056 (facsimile)
wreed@lewisrice.com

*Attorneys for Plaintiff Wholesale Alliance, LLC d/b/a Pharmacy First and Third Party Station*